

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 10, 2025

**BY ECF**
The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Naasón Joaquín García, et al.*, No. S1 25 Cr. 370 (LAP)

Dear Judge Preska:

  This morning, the U.S. District Court for the Southern District of New York unsealed Indictment S1 25 Cr. 370, which charges Naasón Joaquín García ("Naasón"), Rosa Sosa, Azalia Rangel García, Eva García de Joaquín, Joram Núñez Joaquín, and Silem García Peña with federal racketeering, child pornography, and sex trafficking offenses. The Indictment charges that the defendants participated in the Joaquín LLDM Enterprise, a group who, for years, exploited members of La Luz Del Mundo Church. Naasón, García de Joaquín, and Núñez Joaquín were taken into federal custody this morning in California and Illinois. Sosa, Rangel García, and García Peña remain at large, likely in Mexico, where Rangel García has been a fugitive for over six years.

  The Indictment charges the defendants with exploiting the power, doctrine, and structure of the LLDM Church to threaten, coerce, and sexually abuse girls, boys, and women in the LLDM Church; to engage in financial crimes; and to obstruct criminal investigations into their misdeeds.[1] The defendants and their coconspirators executed this scheme over the course of decades, abusing generations of Church members and then destroying evidence to obstruct detection by law enforcement. The defendants and their coconspirators used the LLDM Church as a vehicle to commit sex trafficking of women and children in the United States, Mexico, Europe, Asia, Africa, and elsewhere; to induce victims, including children, to travel to engage in forced and unlawful sex acts; to produce, receive, distribute, and possess child pornography; to employ forced labor of Church members; to illegally structure cash transactions and bulk cash smuggling; and to obstruct justice to hide their crimes.

  As detailed below, there is no condition or combination of conditions that will reasonably assure the appearance of the defendants as required, the safety of the community, or the integrity of the proceedings. Naasón has engaged in a long-running pattern of sadistic sexual abuse of children and adults, making it abundantly clear that he is dangerous and poses a serious, ongoing

---

[1] Capitalized terms have the meaning given to them in Indictment S1 25 Cr. 370 (LAP) (S.D.N.Y.) unless otherwise defined.

risk to the community. Naasón, García de Joaquín, and Núñez Joaquín all pose a serious risk of flight, as they all have deep foreign ties, access to vast internationally accessible wealth, substantial motives to flee, and strong connections to coconspirator Rangel García, who has been a fugitive of justice believed still to be present in Mexico since she was charged for similar conduct by state prosecutors in California in 2019. And all three defendants also pose a risk of obstructing these federal proceedings. Indeed, Núñez Joaquín and other coconspirators actively obstructed the state proceedings in California following Naasón's arrest in 2019 by, among other things, destroying evidence and pressuring victims to sign false documents.

There are simply no conditions that will ensure that the defendants would not engage in the same conduct here. Neither Naasón nor García de Joaquín can overcome the statutory presumption in favor of detention, and Núñez Joaquín is a serious risk of flight and obstruction. The Court should order them detained.

## Background

### A. An Overview of the History and Doctrine of the LLDM Church

NAASÓN's exploitation of the church and its members follows a deeply disturbing tradition established by his father (Samuel Joaquín Flores) and his grandfather (Eusebio Joaquín González, known as "Aarón"), who founded the church in Guadalajara, Mexico, in approximately 1926. Beginning with Aarón and continuing with Samuel and then NAASÓN, each member of the Joaquín Family who has served as the leader or "Apostle" has taken advantage of his position of power and control over the LLDM Church to sexually abuse, exploit, and rape its congregants. Each leader manipulated girls and young women by conveying that they could earn a special "blessing" by serving him, which often ultimately included sexual activity, including oral sex, manual stimulation, and ultimately, penetrative sex with the victims. This abuse occurred over the course of generations.

The LLDM Church is based in Guadalajara, Mexico. The LLDM Church occupies a large compound in Guadalajara that includes a large temple and living quarters for the Joaquín Family, other LLDM Church leaders, and servants of the Joaquín Family. There are also LLDM Church locations throughout the United States, including in California, New York, Nevada, Texas, Georgia, Indiana, North Carolina, South Carolina, New Jersey, and Washington D.C., among other places. The LLDM Church claims to have a presence in over fifty countries and to have millions of members worldwide, although estimates vary, and reliable membership statistics are unavailable.

The LLDM Church doctrine, propagated and later abused by Aarón, Samuel, and Naasón, teaches, among other things, that the only way for members of the LLDM Church to obtain eternal salvation is to follow the teachings of the Apostle, and God will punish and eternally damn anyone who doubts the Apostle, fails to follow the Apostle's teachings, or defies the Apostle.

To LLDM Church members, serving the Apostle and his family is a blessing and can lead to eternal salvation. Members of the LLDM Church are expected to tithe a portion of their income to the LLDM Church. Members are also frequently expected to make additional cash offerings that benefit the Apostle and the Joaquín Family.

### B. The Defendants Exploited LLDM Church Culture and Doctrine to Engage in Criminal Acts

Samuel and Naasón abused, exploited, coerced, and threatened children, women, and others within the LLDM Church. Samuel and Naasón relied on, exploited, manipulated, and corrupted the culture, resources, and members of the LLDM Church. Through this scheme, Samuel and Naasón demanded absolute, unquestioning obedience, which they exploited to achieve criminal purposes.

Samuel, Naasón, and their coconspirators used the LLDM Church to perpetrate sexual abuse of Church members, including children, across generations. From 1964 through his death in 2014, Samuel sexually abused numerous girls and women in the Church. Samuel's abuse, in turn, served as a model for his son, Naasón, who likewise abused girls and women in the LLDM Church during his time as Apostle, which continues to this day. As a result of this decades-long cycle of abuse, many of Samuel's victims were the mothers of girls and women abused by Naasón.

Samuel relied upon a select group of women—including his wife, defendant Eva García de Joaquín, and defendant Rosa Sosa—to identify girls and women for sexual abuse and to "groom" them for sexual abuse, *i.e.*, to convince, manipulate, and coerce victims to submit to sexual abuse and prepare the victims for abuse by exploiting their ages and vulnerabilities. Alone and with the assistance of others, Samuel directed minor girls to engage in sex acts, including oral sex, manual sex, and sexual intercourse with him and with other girls and women. Samuel also vaginally and anally raped multiple victims and forced minor girls to engage in sadistic sexual rituals for his sexual gratification.

García de Joaquín played an important role in Samuel's abuse. As described in detail below, over the course of decades, García de Joaquín used various tactics to prepare young female LLDM Church members for Samuel to abuse, and she participated in group sex with Samuel and minors. García de Joaquín's tactics included befriending some victims when they were young teenagers and slowly introducing the victims to sexual topics that were otherwise forbidden by LLDM Church doctrine, creating a form of sexual intimacy with the victims. Then, at Samuel's request, García de Joaquín would use those close relationships to encourage the victims to have sex with Samuel. With other victims, the tactics were more brutal: At Samuel's request, García de Joaquín physically restrained at least one minor victim while Samuel penetrated her.

Following Samuel's death, defendant Azalia Rangel García and others, began working for Naasón to help him sexually abuse and rape children and women in the LLDM Church. At Naasón's direction, coconspirators identified and primed girls and boys as young as thirteen years old for Naasón's sexual abuse. Alone and with the assistance of others, Naasón required minor girls and women to engage in sex acts, including oral sex, manual sex, and sexual intercourse with him. Naasón also directed girls, boys, and women to engage in group sex with each other, often in his presence, for his sexual gratification. Naasón, with the assistance of others, also directed minors to create photographs and videos of sex acts, which were transmitted to Naasón by cellphone messaging applications and internet communications.

García de Joaquín, Sosa, Rangel García, and others received powerful positions in the Joaquín LLDM Enterprise on account of their facilitation of, and participation in, the Joaquín

LLDM Enterprise's sex trafficking, and on account of their requiring the victims to engage in sex acts with Naasón or Samuel and with others at the Naasón's or Samuel's direction. Some of their specific conduct facilitating—and participating in—sexual abuse of minors and young women is described below:

Members of the Joaquín LLDM Enterprise, including Sosa, Rangel García, and García de Joaquín, also directed many of the victims to travel with Naasón and Samuel whenever they traveled to various destinations within the United States, including Manhattan, and around the world, including to Mexico, Malaysia, the United Kingdom, Spain, Portugal, Poland, South Africa, Australia, and elsewhere, so that Naasón and Samuel could abuse the victims whenever he wanted. Naasón and his father sexually abused and raped victims during these trips, often with the direct assistance of Sosa, Rangel García, and García de Joaquín, and others.

Members of the Joaquín LLDM Enterprise communicated and directed others to communicate with minor victims by cellphone through calls and messaging applications to direct them to come to particular locations at particular times so that Naasón could sexually abuse the minor victims, cause other adults to sexually abuse the minor victims for Naasón's sexual gratification, and create photographs and video recordings of the minor victims engaging in sexually explicit conduct.

Members of the Joaquín LLDM Enterprise also manipulated and coerced minor victims to engage in sexually explicit conduct for the purpose of producing photographs and videos of such conduct for Naasón's sexual gratification. At Naasón's direction, coconspirators used cellphones and other recording equipment to capture these photographs and videos containing child pornography, and then sent the photographs and videos to Naasón through cellphone messaging applications and internet communications. Naasón stored these photographs and videos on his cellphone, iPad, computers, and external hard drives that he carried with him so that he could access the child pornography whenever he wanted, including during Naasón's interstate and international trips. This investigation identified hundreds of child pornography images that were created at Naasón's direction and then sent to Naasón via cellphone.

### C. The Defendants Also Financially Exploited the LLDM Church Community

In addition to sexually abusing LLDM Church members, Naasón, Samuel, and other members of the Joaquín LLDM Enterprise exploited the members of the LLDM Church to enrich themselves. Many LLDM Church members, including victims of the sexual abuse schemes described above, served the Joaquín Family as construction workers, nannies, aides, accountants, cleaners, and in other capacities for no pay. Members and associates of the Joaquín LLDM Enterprise maintained control overs these members, whom they forced to work long hours with little sleep and without pay, by manipulating and coercing them through exploiting LLDM Church doctrine. These members of the LLDM Church believed that they would suffer ostracization and eternal damnation if they did not comply with their work orders.

Members of the Joaquín LLDM Enterprise also financially exploited the LLDM Church community. Members of the LLDM Church were expected regularly to tithe a portion of their income to the LLDM Church and periodically make additional cash offerings, "love offerings," as requested by Naasón and Samuel and other LLDM Church leaders. Unbeknownst to the LLDM

Church members who made these donations—many of whom had limited financial resources—Naasón used "love offerings" to fund his sexual abuse. Naasón directed members of the LLDM Church's extensive hierarchy to use the donated cash to fund purchases of items used in the sex trafficking and child pornography production scheme, including masks that Naasón used to trick young boys into having incestual sex with their relatives while Naasón recorded the encounter, sex toys that Naasón directed coconspirators to use on teenage girls, and costumes and lingerie that Naasón directed coconspirators to have young teenage girls wear during child pornography photoshoots. Naasón also instructed others to use "love offerings" to pay for cleaning supplies for his office and bedroom after he abused victims to destroy any evidence of his abuse. Naasón, Samuel, and the Joaquín Family also used cash "love offerings" and tithes to fund the Joaquín Family's lavish lifestyles, which included purchasing luxury cars, watches, designer clothing, and first-class travel around the world; during such travel, Naasón routinely sexually abused young women who traveled with him for that purpose.

Cash donations by LLDM Church members were often transported by the defendants and their coconspirators to various Church locations around the world and to the Apostles' principal homes in Los Angeles and Guadalajara. Samuel, Naasón, and their aides regularly required LLDM Church members and the victims of their sexual abuse to transport large sums of cash between and across international borders, including into and out of the United States. Prior to a trip, aides would distribute cash to several LLDM Church members, typically in amounts slightly under $10,000 to avoid cash reporting requirements. After arriving at their destination, the victims were required to return the cash to the aides, who then used the cash for the personal benefit of Samuel, Naasón, and the Joaquín Family, including García de Joaquín.

### D. The Defendants Systematically Obstructed Justice After Naasón's 2019 Arrest

In June 2019, Naasón and two accomplices were arrested by state authorities in Los Angeles, California, and charged with certain state sexual abuse crimes relating to five victims, including three minor victims. Defendant Rangel García was also charged in the California criminal case, but she was not arrested and remains a fugitive. Naasón eventually pled guilty to one count of lewd act upon a child and two counts of forcible copulation with a minor (taking responsibility for victimizing just three minors), and he was sentenced to sixteen-years and 8 months' imprisonment subject to parole.

Following Naasón's arrest, defendants Núñez Joaquín, García Peña, and others orchestrated a coverup. The defendants and their coconspirators helped Rangel García to hide in Mexico, where she remains a fugitive to this day. Núñez Joaquín, García Peña, and others also pressured victims to sign false declarations disclaiming that any abuse occurred; drafted and disseminated sermons stating that all sexual abuse victims were lying and reinforcing the doctrine that doubting Naason was a sin punishable by eternal damnation; destroyed documents, sex toys, lingerie, and electronic devices, and directed other LLDM Church members to do the same; and held a victim in Mexico in an attempt to prevent the victim from cooperating with law enforcement. During Naasón's California criminal case, his lawyers presented some of those false declarations as genuine denials of Naasón's culpability.

**E. Searches Executed at Naasón's and García de Joaquín's Residences**

During the morning of September 10, 2025, law enforcement officers searched Naasón's and García de Joaquín's residences in East Los Angeles, which are back-to-back on the same block. As described further below, García de Joaquín's residence is the home she shared with Samuel before he died.

Both Naasón's and García de Joaquín's residences contained evidence of the charged conduct and of the defendants' vast resources, which could finance their flight from prosecution. Across both residences, law enforcement officers seized well over $1 million in U.S. currency in various denominations and substantial amounts of foreign cash, including Euros and Canadian dollars. Much of the U.S. currency was found in small envelopes consistent with the "love offerings" that Naasón used to pay for supplies for the sex trafficking scheme, among other things. U.S. currency was also found in numerous safes, large containers, and luggage items spread throughout Naasón's and García de Joaquín's residences. Law enforcement officers also found numerous gold coins, pure gold and platinum pieces, luxury watches, and jewelry in both residences. Sample images of the cash and valuables that law enforcement found at the defendants' residences this morning are below:




At García de Joaquín's residence, law enforcement officers discovered a trap door hidden underneath a bed in one of the bedrooms. The door led to an underground compartment containing a safe and a dehumidifier. Inside the safe, officers found approximately $220,000 in carefully arranged stacks of bills, expensive jewelry, a jade-wrapped USB drive, and over a dozen gold

coins. An image of the passage from the trap door to the underground safe and the cash found inside the safe is below:



At Naasón's residence, law enforcement also found direct evidence of the charged sex crimes. Naasón's office contained straps designed and arranged to be used as a sex swing. Naasón's garage contained a mesh bag full of lingerie consistent with the clothing that minor and adult victims were required to purchase for their dances for Naasón. And Naasón's garage also contained a sex toy consistent with the types of items used in child pornography images and videos created at Naasón's direction. Sample images of the lingerie and sex toys are below.




## **Argument**

### I.     **Applicable Law**

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e).[2] A finding of risk of flight must be supported by a preponderance of the evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.

Obstruction of justice is another ground for pretrial detention by the courts. *See* 18 U.S.C. § 3142(f)(2)(B); *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000). Courts in the Second Circuit have held that pretrial detention for obstruction of justice is appropriate as long as the Government can establish by "clear and convincing evidence" that "there exists a serious risk" the defendant would "threaten, injure, or intimidate, a prospective witness or juror." *United States v. Leon*, 766 F.2d 77, 82 (2d Cir. 1985); *see also United States v. Zherka*, 592 F. App'x 35, 35 (2d Cir. 2015) (summary order) ("A serious risk of obstruction of justice may qualify as ... a danger to the community.").

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense is a violation of section 1591 or involves a minor victim; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character,... past conduct,... [and] financial resources"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also LaFontaine*, 210 F.3d at 130-31 (Government entitled to proceed by proffer in detention hearings).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Additionally, where a defendant is charged with an offense under

---

[2] The Court is required to hold a detention hearing on the Government's motion where, as here, the case involves "a crime of violence," "a violation of section 1591," "an offense for which the maximum sentence is life imprisonment," or "any felony that is not otherwise a crime of violence that involves a minor victim." 18 U.S.C. § 3142(f)(1)(A), (B), (E). The same is true where a defendant presents a "serious risk" of flight or obstruction of justice. 18 U.S.C. § 3142(f)(2).

chapter 77 of Title 18 for which the maximum punishment is life imprisonment, such as sex trafficking conspiracy in violation of 18 U.S.C. § 1954, or with certain sex offenses involving minors, there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. §§ 3142(e)(3)(D), (E).

## II.     Discussion

### A.   Naasón Joaquín García

Naasón Joaquín García is currently serving a limited term of imprisonment in California state custody. Nevertheless, the Government is entitled to a detention hearing for Naasón because his charges involve "a crime of violence," "a violation of section 1591," "an offense for which the maximum sentence is life imprisonment," and "any felony that is not otherwise a crime of violence that involves a minor victim." 18 U.S.C. § 3142(f)(1)(A), (B), (E). The Court must also presume as a matter of law that Naasón cannot be released because he is charged with sex trafficking conspiracy, in violation of 18 U.S.C. § 1954, and with sex offenses involving minor victims, unless he rebuts the statutory presumption that no condition or combination of conditions will reasonably assure his appearance and the safety of the community. *See* 18 U.S.C. §§ 3142(e)(3)(D), (E).

Naasón cannot rebut the presumption of detention because he is an extraordinary danger to the community and poses a serious risk of flight. Naasón has led extensive sex trafficking and child exploitation schemes for years. Through the testimony of victims, text messages, emails, images and videos seized from electronic devices and accounts used by Naasón and his coconspirators, and other evidence, the Government will establish at trial that Naasón and his coconspirators have victimized at least dozens of minor and adult LLDM Church members in Mexico, the United States, and elsewhere. Naasón trafficked victims on multiple international trips to Asia, Europe, Africa, Mexico, and the United States, and he has strong international ties to Mexico and other foreign jurisdictions, including jurisdictions where there is no extradition treaty or from which extradition would be difficult or uncertain. Naasón also directed and oversaw the production of at least hundreds of images and videos of child sex abuse, including for example multiple sadistic scenes in which Naasón forced young teenage boys to wear masks while they unknowingly engaged in incestual sex with their family members. Given that Naasón engaged in the systematic sexual abuse of numerous minor and adult victims for years, it is clear that Naasón believes that he is above the law, and there is no reason to believe that Naasón would follow the instructions of this Court if released.

### B.   Eva García de Joaquín

The Government is entitled to a detention hearing for Eva García de Joaquín for the same reasons that it is entitled to a detention hearing for Naasón. *See* 18 U.S.C. § 3142(f)(1)(A), (B), (E). The Court must also presume as a matter of law that García de cannot be released because she is charged with sex trafficking conspiracy, in violation of 18 U.S.C. § 1954, unless she rebuts the statutory presumption that no condition or combination of conditions will reasonably assure his appearance and the safety of the community. *See* 18 U.S.C. §§ 3142(e)(3)(D)

Although she is nearly eighty years old, in light of her extensive foreign ties and resources, and the prospect that she will be sentenced to a significant term of incarceration for her repeated participation in hands-on sexual abuse of children, García de Joaquín cannot rebut the presumption that there is no condition or combination of conditions that will reasonably assure her appearance as required.

### 1. Eva García de Joaquín's Integral Role as A Hands-On Abuser of Multiple Minor Victims and Beneficiary of the Defendants' Exploitation Scheme

Eva García de Joaquín is the longest-tenured member of the charged conspiracy. As the wife of Samuel Joaquín Flores and mother of Naasón Joaquín García, García de Joaquín has continuously participated in the exploitation of the LLDM Church community, as described in part below.

*Eva García de Joaquín's Participation in Samuel's Abuse and Exploitation of LLDM Church Members*

For decades, García de Joaquín directly participated in and enabled Samuel's heinous sex crimes. Below are summaries of just a few examples of the abuse perpetrated by García de Joaquín, Samuel, and others during García de Joaquín's time as Samuel's wife, which multiple witnesses will describe at trial.

In the late 1960s and early 1970s, García de Joaquín befriended a minor Church member who had just moved to the LLDM Church's headquarters in Guadalajara. García de Joaquín and Samuel primed this girl for sexual abuse by slowly exposing her to sexually explicit reading material and pornography, which was strictly forbidden according to the doctrine propagated by Samuel. When this victim was approximately sixteen years old, García de Joaquín invited her on a trip with Samuel. One night during the trip, Samuel and García de Joaquín invited the minor victim into a private room. García de Joaquín then held the minor victim down so that Samuel could rape her. After this event, Samuel and García de Joaquín kept the minor victim at their home in Guadalajara where Samuel repeatedly raped her with García de Joaquín's knowledge.

In or about the late 1970s, García de Joaquín facilitated the abuse of another young teenage girl. After this victim's baptism at age fourteen, at Samuel's direction, the victim began to serve Samuel as a waitress and aide, bringing him food and water and massaging Samuel's feet. Within days, this evolved into Samuel and García de Joaquín inviting the minor victim to lay in bed with them alone, where Samuel would touch the minor's breasts while García de Joaquín laid next to them. After a while, García de Joaquín began touching and kissing the minor victim as well, at Samuel's direction. Samuel and García de Joaquín's later invited the minor victim to travel with them. One day, during a trip to Mexico, García de Joaquín invited the minor victim into Samuel's room while Samuel's penis was erect. The minor victim tried to leave, but Samuel grabbed her and forced his penis into her mouth. For years thereafter, García de Joaquín traveled with Samuel and this victim on trips around the United States. During one trip to New York City, Samuel raped yet another minor LLDM Church member.

In or about the late 1980s, García de Joaquín facilitated Samuel's sexual abuse of a nine-year-old LLDM Church member. The victim was brought to Samuel's room, where Samuel was

laying underneath the covers of his bed with García de Joaquín. Samuel and García de Joaquín were both naked. The victim was then directed to give Samuel a foot massage. Shortly thereafter, García de Joaquín left Samuel alone in the room with the minor victim, and Samuel called on the victim to get undressed and take García de Joaquín's place in his bed. When the nine-year-old got into bed with Samuel, he made her touch his penis.

In or about the late 1990s and early 2000s, García de Joaquín participated in Samuel's sexual abuse of yet another minor LLDM Church member. When this victim was sixteen years old, García de Joaquín and Samuel required this victim to participate in group sex with the two of them in Mexico. When this victim was nineteen years old, during a trip in the United States, García de Joaquín told the victim that Samuel was "ready" for her shortly before Samuel sexually abused the victim again.

As Samuel's wife and coconspirator, García de Joaquín enjoyed extraordinary privilege. Samuel and García de Joaquín spent LLDM Church donations as if the Church coffers were their own personal bank accounts, and they lived off Church members' free labor. Samuel purchased expensive gifts for García de Joaquín, such as expensive watches and jewelry. Samuel and García de Joaquín also lived together in a large home in Los Angeles that was constructed by LLDM Church members for no pay. The house was adorned with so many luxurious items, such as gold leaf lining the house's molding, that LLDM Church members refer to it as the "Versace" house.

*Eva García de Joaquín's Continued Participation in Naasón's
Exploitation of LLDM Church Members*

After Samuel's death in 2014, García de Joaquín supported the ascension of her son, Naasón, to become the next Apostle and leader of the Joaquín LLDM Enterprise. García de Joaquín's political support enabled Naasón to assume control of the LLDM Church and take the seat that Samuel had occupied. García de Joaquín surely knew that, as the Apostle, Naasón would claim the right to continue his father's legacy of systematic sexual abuse and exploitation.

Emails, text messages, surveillance, and witness testimony will also show that García de Joaquín has also continued, to this day, to profit from the Joaquín LLDM Enterprise's exploitation of church members. García de Joaquín continues to live in the "Versace" house in Los Angeles, where LLDM Church members cook, clean, and wait on her. And García de Joaquín continues to take expensive flights and be driven by young LLDM Church members in fancy cars, all funded by the LLDM Church donations.

2. **No Bail Conditions Can Reasonably Assure Eva García de Joaquín's Presence as Required**

García de Joaquín is, without a doubt, "more likely than not" a flight risk. *United States v. Brennerman*, 705 F. App'x 13, 16 (2d Cir. 2017); *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011).

*First*, García de Joaquín has strong foreign ties, ample financial resources, and access to a wide base of supporters who could, and in all likelihood would, aid her flight from prosecution, all of which provide her with a substantial opportunity to flee. *See, e.g.*, *United States v. Zarrab*, 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (finding pattern of "extensive international

travel" and "ties to foreign countries" to "weigh in favor of ... detention"); *United States v. Bikundi*, 47 F. Supp. 3d 131, 137 (D.D.C. 2014) ("The Court finds that the defendant has continuing significant foreign ties to her country of origin, including potential access to funds located in Cameroon, and that this raises a significant concern about her serious risk of flight."); *United States v. Fishenko*, 2013 WL 3934174, at *2 (E.D.N.Y. July 30, 2013) (noting that the fact that the defendant "frequently travels to Russia for business increases the likelihood of flight" (internal quotation marks omitted)); *United States v. Alexander*, 24 Cr. 676 (VEC) (S.D.N.Y. Jan. 16, 2025) (finding that the defendants were a risk of flight because of substantial ties to a foreign country, including that their parents own real estate in a foreign country and family members reside in that country).

García de Joaquín's foreign ties are obvious: The LLDM Church is based in Guadalajara, Mexico, and García de Joaquín is a citizen of Mexico.[3] The LLDM Church also has outposts with devoted loyalists in many countries around the world, including Ecuador and Venezuela, which have no extradition treaty with the United States. *See, e.g.*, *United States v. Amanat*, 454 F. Supp. 3d 358, 362 (S.D.N.Y. 2020) (finding "international travel" and "substantial connections with Dubai – a country with which the United States does not have an extradition treaty" weighed in favor of detention). Even if García de Joaquín were to flee to a country with which the United States does have an extradition treaty, apprehending her in a foreign jurisdiction after she fled in violation of any bail conditions would be a considerable challenge with no clear prospect of success, and extraditing her would likely be a lengthy process that could take years. *See United States v. Alexander*, 24 Cr. 676 (VEC) (S.D.N.Y. Jan. 16, 2025) (relying in part on the fact that any extradition procedures would likely be lengthy in determining that the defendants were a risk of flight). As described further below, García de Joaquín's co-defendant Azalia Rangel García has remained a fugitive since she was charged for related conduct in 2019. Rangel García has successfully evaded detection for over six years with the assistance of the defendants and their coconspirators, raising the real possibility that García de Joaquín would be able to do the same.

García de Joaquín also has the financial means to finance her flight from prosecution and to evade any subsequent attempts to apprehend her. The defendants and their coconspirators have made it a practice for decades to smuggle bulk cash earmarked for García de Joaquín and other Joaquín Family members illicitly across international lines. The defendants and their coconspirators execute this structuring scheme by splitting large cash sums among several members in amounts slightly less than $10,000 to avoid reporting requirements and then having the members give the cash back to a Joaquín Family member or aide after crossing the border. Witnesses have reported observing hundreds of thousands of U.S. dollars hidden beneath LLDM Churches in Mexico and elsewhere because of this extensive smuggling scheme. Further, García de Joaquín and her coconspirators have access to numerous properties abroad where García de Joaquín could comfortably live in hiding should she flee. As the Government's evidence makes clear, the Joaquín Family frequently directed victims and other LLDM Church members to purchase properties in their own names that would be controlled by the Joaquín Family to conceal the Joaquín Family's de facto ownership of those properties. This practice would enable García de Joaquín more easily to evade detection by law enforcement by residing in properties that she or her family controls but do not legally own.

---

[3] García de Joaquín is also a lawful permanent resident in the United States.

García de Joaquín's age (she is nearly eighty years old) does not ameliorate the significant risk that she would use her foreign ties to evade prosecution. García de Joaquín's age has not prevented her from traveling internationally—as recently as August 29, 2025, García de Joaquín flew back from Guadalajara to the United States. Moreover, as described above, García de Joaquín has an extensive history of foreign travel funded by LLDM Church donations, including on private jets that can easily accommodate her.

*Second*, the possibility that García de Joaquín will receive a substantial sentence—one that might amount to a life sentence—provides her with ample motive to act on those opportunities to flee. *See, e.g.*, *United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [defendant's] Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); *United States v. Blanco*, 570 F. App'x 76, 77 (2d Cir. 2014) (affirming district court's order of detention because, inter alia, defendant "face[d] a mandatory minimum prison sentence of five years, a possible maximum sentence of 40 years"); *United States v. Green*, 2020 WL 5814191, at *2 (S.D.N.Y. Sept. 30, 2020) (noting that substantial sentence defendant may face weighed in favor of finding that defendant was a flight risk).

The crimes with which García de Joaquín is charged—racketeering conspiracy and sex trafficking conspiracy—both carry statutory maximum sentences of life imprisonment. And in light of the pervasive, hands-on sexual abuse of children described above, if convicted, García de Joaquín would likely be facing a Sentencing Guidelines range of life imprisonment or a range that effectively would be life imprisonment for García de Joaquín.[4] García de Joaquín has every incentive, and every reason to flee, especially considering the vast evidence in the case, including the victim accounts and corroboration described above.

The prospect for reputational harm augments García de Joaquín's incentives for flight. The nature of this case has the potential to significantly and negatively impact García de Joaquín's reputation and the reputation of her family. A public prosecution and trial in this case—which will involve testimony about García de Joaquín helping her husband forcibly penetrate teenagers, sexually abuse prepubescent children, and use LLDM Church donations and labor to fund her elaborate lifestyle—will drastically impact that reputation. García de Joaquín has every incentive to flee to avoid a public trial putting her criminal exploits, and those of her husband and son, on display. *See, e.g.*, *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) ("[I]ncentive to flee ... naturally bears upon and increases the risk of flight."); *United States v. Sammons*, 2020 WL 613930, at *5 (S.D. Ohio Feb. 10, 2020) ("The shame of the allegations that he is facing is also an immense incentive to flee.").

---

[4] Recent examples in the Southern and Eastern Districts of New York for sex trafficking and similar offenses show that García de Joaquín would likely face at least an effective-life sentence her conduct. *See United States v. Paduch*, 23 Cr. 181 (RA), Dkt. No. 186 (S.D.N.Y. Nov. 21, 2024) (life sentence); *United States v. Robert Hadden*, 20 Cr. 468 (RMB), Dkt. No. 319 (S.D.N.Y. July 25, 2023) (twenty-year sentence) *United States v. Ray*, 20 Cr. 110 (LJL), Dkt. No. 615 (S.D.N.Y. Jan. 31, 2023) (sixty-year sentence); *United States v. Maxwell*, No. 20 Cr. 330 (AJN), Dkt. No. 696 (S.D.N.Y. June 29, 2022) (twenty-year sentence); *United States v. Raniere*, No. 18 Cr. 204 (NGG), Dkt. No. 969 (E.D.N.Y. Oct. 30, 2020) (120-year sentence).

*Third*, the risk that García de Joaquín may act on this combination of opportunity and motive to flee and obstruct this prosecution is hardly theoretical. The last time members of the Joaquín Family were arrested for similar conduct by California state authorities in June 2019, the defendants and their coconspirators engaged in widespread obstruction efforts. As described further below, the defendants and their coconspirators destroyed documents and electronic devices that contained evidence of their crimes, created fake documents to attempt to exculpate the Joaquín Family, and even hid at least one sex crime victim in Mexico against her will to prevent her from contacting law enforcement.

Most importantly for purposes of this bail motion, after the announcement of the state charges against Naasón, co-defendant Azalia Rangel García, and others in 2019, the defendants and their coconspirators helped Rangel García remain a fugitive in Mexico for six years and counting. The defendants and their coconspirators are therefore practiced at harboring fugitives of American justice and would be able to do the same for García de Joaquín were she to be released.

### C.  Joram Núñez Joaquín

The Government is entitled to a detention hearing for Joram Núñez Joaquín, and the Court should order him detained, because, as explained below, Núñez Joaquín's foreign ties and history of obstruction demonstrate that there is both a serious risk that he will flee and a serious risk that he will obstruct this case. *See* 18 U.S.C. §§ 3142(e)(1), (f)(2).

#### 1.  Joram Núñez Joaquín's Role as A Leader in the Efforts to Obstruct Justice

Joram Núñez Joaquín is a relative of Samuel and Naasón and a member of the Joaquín Family. Núñez Joaquín has occupied leadership roles in the LLDM Church by virtue of his ties to Naasón, and he has traveled frequently with Naasón on international trips. Núñez Joaquín has also falsely held himself out as a lawyer working on behalf of the LLDM Church, when in fact he was not admitted to practice law in any State.[5] Núñez Joaquín used that false professional title to prevent, and to attempt to prevent, victims of sexual abuse from reporting the abuse to law enforcement.

After Naasón was arrested in June 2019, Núñez Joaquín led an effort within the LLDM Church community to close ranks, identify Naasón's victims, and devise a plan to silence them. Multiple witnesses observed and participated in private meetings with minor victims of Naasón's abuse and their family members that Núñez Joaquín and other coconspirators held at a hotel in Los Angeles shortly after Naasón's arrest. During these meetings, Núñez Joaquín and others attempted to convince the minor victims and their parents that Naasón's sexual abuse was not wrongful and that they should not report their abuse to law enforcement. Núñez Joaquín also used these meetings to locate evidence of Naasón's abuse, such as sex toys and lingerie, which Núñez Joaquín then collected and destroyed. Núñez Joaquín told a victim that he could be disbarred or prosecuted for obstruction of justice for destroying the evidence, but he explained that he would give his life for Naasón and was willing to take that risk.

---

[5] Núñez Joaquín did graduate from law school and pass the bar exam, but he was not admitted to any state bar.

Núñez Joaquín also leveraged the false impression that he was a practicing lawyer to pressure several of Naasón's victims to sign false affidavits he created that supposedly exculpated Naasón. The Government has obtained a draft copy of one victim's false exculpatory affidavit from a search of Núñez Joaquín's email account.

Núñez Joaquín, co-defendant Silem García Peña, and others also participated in holding one of Naasón's victims in Mexico to prevent her from speaking with law enforcement. In the wake of Naasón's arrest, Núñez Joaquín and others convinced this victim to travel to Mexico and live with LLDM Church members. Once the victim arrived in Mexico, the defendants and their coconspirators prevented her from leaving out of fear that she may testify against Naasón. The defendants and their coconspirators kept this victim in Mexico for many months, at times under the watch of armed guards acting at García Peña's direction. The victim required assistance from U.S. law enforcement officers to escape from the LLDM Church guards and return to the United States.

2. **Joram Núñez Joaquín Poses a Serious Risk of Flight and Obstruction, and No Bail Conditions Can Reasonably Assure His Presence as Required or the Safety of the Community**

Like García de Joaquín, Núñez Joaquín has the same opportunities and motives to flee prosecution. Núñez Joaquín has similar international ties to the LLDM Church headquarters in Guadalajara, which Núñez Joaquín's extended family owns, and to LLDM Church outposts in various countries around the world. Like García de Joaquín, Núñez Joaquín could easily reside in any of the Joaquín Family's international residences without detection, as other LLDM Church members often title those properties in their own name intentionally to conceal Joaquín Family's connection to the property. And like García de Joaquín, Núñez Joaquín would be able to rely on the help of coconspirators to evade law enforcement should he flee, just as Rangel García has successfully done for years.

Núñez Joaquín also has access to the Joaquín Family's vast financial resources and network of smuggled cash, and he has an extensive history of international travel funded by LLDM Church donations. And although Núñez Joaquín is not charged with participating in the sexual abuse conduct, he has a substantial incentive to flee, given the strength of the evidence against him and significant impact that a criminal conviction in this case (which would be Núñez Joaquín's first) would have on Núñez Joaquín's life and potential career as a lawyer, should he actually seek admission to the bar.

Moreover, as part of the charged racketeering conspiracy, Núñez Joaquín has already engaged in extensive efforts to obstruct of justice, and he is likely to do so again if released. *See* 18 U.S.C. § 3142(g)(1). As described above, the last time members of the LLDM Church community were arrested for similar state charges, Núñez Joaquín orchestrated a campaign of obstruction to silence and disappear witnesses and to destroy and fabricate evidence. Given Núñez Joaquín's history of engaging in obstructive conduct to conceal his coconspirators criminal activity, there is every reason to believe that he will continue to engage in such obstruction of this case if released. *See* 18 U.S.C. § 3142(g)(3); *see also United States v. Combs*, No. 24 Cr. 542 (AS) (S.D.N.Y.) (Sept. 17, 2024 Hr'g Tr.) (transcript of bail hearing in which defendant was denied bail

due to risk of flight and obstructive conduct); *United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y.) (Aug. 2, 2019 Hr'g Tr.) (same).

## Conclusion

      Naasón Joaquín García, Eva García de Joaquín, and Joram Núñez Joaquín should be detained without bail pending trial.

                                Respectfully submitted,

                                JAY CLAYTON
                                United States Attorney

               By:    /s/_____
                                Ryan W. Allison
                                Lisa Daniels
                                Elizabeth A. Espinosa
                                Michael R. Herman
                                Assistant United States Attorneys
                                Southern District of New York
                                (212) 637-2200

cc:     Counsel of record (by ECF)