

December 5, 2025

The Honorable Judge Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:** **United States v. Naasón Joaquín García, et al., S1 25 Cr. 370 (LAP)**

Dear Judge Preska:

We represent Defendant Eva García de Joaquín ("Eva" or "Ms. de Joaquín") in the above-referenced matter. We submit this letter in response to the government's detention letter dated September 10, 2025, which seeks the detention of all charged defendants.

The charges here span decades and generations, and involve scores of people across the globe, but Eva is a frail and tiny eighty-year-old woman who is a tiny part of the government's sprawling indictment. Of the six-count indictment, the government charges Eva with only two. The government does not (because it cannot) credibly allege that Eva—a feeble eighty-year-old, five-foot-tall woman with a sixth-grade education and no criminal history—presently poses a real danger to the safety of her community. So instead, the government cites nebulous allegations of Eva's wrongdoing from *two decades past* to support its wobbly contention that Eva currently poses a threat to her community. Even assuming those allegations were true (which they are not), they do not support the government's detention application. Accordingly, this Court should order the pre-trial release of Eva on the following proposed bail package because the conditions in it assuredly guarantee Eva's presence at trial. Those conditions are: (1) a $5,000,000 bond partially secured by over $2,000,000 of property; (2) eight blood relative co-signers; (3) home detention with GPS monitoring; and (4) all other standard pre-trial release conditions. As explained in more detail below, Eva's

proposed bail package offers this Court a clear set of conditions that reasonably assures her appearance throughout this criminal proceeding.

### A.    Background

#### 1.    La Luz del Mundo: Origins and Principles

La Luz del Mundo ("LLDM" or the "Faith") is not a single church.  LLDM is a Christian religion, much like Catholicism or Evangelicalism, that follows the teachings of Jesus Christ per the New King James bible.  The Faith was founded in 1926 in Guadalajara, Mexico, and now has several other locations around the globe.  LLDM believes that Jesus Christ's sacrifice vindicated man with God and that salvation is only attained through Jesus Christ.  According to LLDM doctrine, the Apostles of Jesus Christ preach the Gospel of Jesus Christ to every person, advancing the work of salvation through baptism.  Since its founding in 1926, LLDM has had three Apostles: Eusebio Joaquín González ("Aaron"); then, upon Aaron's death, Samuel Joaquín Flores (Aaron's son); and then, upon Samuel's death, Naasón Joaquín García (Samuel and Eva's son).  Eva is the eighty-year-old widow of Samuel Joaquín Flores ("Samuel"), the second leader or "Apostle" of LLDM, the daughter-in-law of late Aaron, the first Apostle, and the mother of Naasón, the current Apostle.

In the United States, LLDM has several locations, including in California, New York, Nevada, Texas, Georgia, Indiana, North Carolina, South Carolina, New Jersey, and Washington, D.C.  The Faith currently has a membership of approximately three to five million people worldwide.  In addition to its houses of worship, LLDM maintains schools and church-affiliated organizations that focus on family services, counseling, violence-prevention and intervention, and educational and professional support for its members.

The government's version of LLDM would rival any anti-religion horror-movie: a corrupt den of venal and libidinous vestment-clad villains praying on generations of congregants to line their pockets and indulge their insatiable carnal lust.  In other words, a façade of a church hiding a factory of sin.  But that isn't true.  Regardless of the guilty plea of one man six years ago, and for a century before that, LLDM has been a real religious community of millions worldwide that has changed, improved, and saved the lives of millions of people through belief in Jesus Christ.  Like other well-established, large global religions that have suffered under the scandal of a few rogue actors, the commitment of the LLDM community

to their religion remains constant; that is because of the lived experience of generations of members of LLDM. For nearly a century, over five generations have belonged to LLDM and raised their children in the religion because of what it really is—a sanctuary of faith where family, community, and God come first—a safe place to raise beloved children who will grow up to be kind, charitable, and accept Jesus Christ as their savior.

Like many Christian denominations, LLDM believes in practicing the word of Jesus Christ, encouraging its members to live a conservative life centered on family, faith, community, charity, and community service. To that end, the Faith encourages its members to avoid common pitfalls that lead to suffering, such as alcohol, drugs, domestic violence, and adultery. LLDM is guided by some key moral principles that are indicative of its ideals and philosophy, including: (1) The rejection of "intolerance and fanaticism, because they undermine human dignity and religious freedom."; (2) Working "for the dignified treatment of all people, including those who share our faith."; (3) "[O]pen[ing] the doors of knowledge, literacy and education as a means to eradicate poverty and achieve social progress . . . ."; and (4) Standing "for the dignity of all persons, as well as respect for their marital status, their property and their moral-ethical principles."[1] In addition, LLDM's congregants abide by specific "civic principles" that demonstrate their respect and appreciation for the law. Specifically, the Faith teaches its congregants "that authorities are established to administer justice, protecting those who do good and correcting those who act outside the law."[2] LLDM also teaches its congregants to "RESPECT and comply with the laws of each country, their cultures and patriotic symbols."[3]

### 2. Eva's Early Life and Role in LLDM

Born in the Chapultepec neighborhood of Mexico City, Mexico, to a humble family dedicated to LLDM, Eva has been devoted to the Faith since her first breath of life. Eva's father briefly attended elementary school and could read and write a little; her mother never went to school at all. Eva's father supported his six children primarily by baking breads and cakes in his home and then selling those on the streets of Mexico City. Sometimes, he traveled to the United States to perform seasonal labor work. Her father also briefly worked as a laborer on buses

---

[1] https://tlotw.org/about-us/moral-principles/
[2] https://tlotw.org/about-us/civic-principles/
[3] *Id.*

or trucks locally in Mexico City. Eva's mother worked hard in the family home to raise her children and prepare them for a life fully committed to living as Christians. Sometimes, little Eva helped her father make money for their family by selling his handmade gelatin treats on the street with her sister. Across the street from her family lived Eva's two aunts and their dozen children, all of whom were deeply connected to each other and the Faith. From birth, Eva's entire life was rooted in Christianity, and her future, like the future of everyone she knew, would be about living in service to LLDM.

Like many traditional families in her community, Eva's parents wanted her future to be one of a wife and mother, equally devoted to her future husband and LLDM. Eva's parents sent their children—both the boys and girls—to elementary school, but once Eva became "a woman" at age fourteen, her father did not think it was appropriate for Eva to leave home and continue her education. And, because Eva found school difficult, she was held back in third grade and had to repeat it. Therefore, despite her own dream to continue her education and become a teacher one day, Eva had only completed the sixth grade when her parents ended her formal education. So, at age fourteen, to prepare for her married life and motherhood, Eva began learning to sew, cook, and knit. Not long after, Eva met her future husband.

Aaron Joaquín was the Apostle of LLDM when Eva was born; she and her family felt incredibly blessed and impressed when they had the chance to meet him. In person, he emanated all the ideals of Christianity, and meeting him only deepened Eva and her family's commitment to LLDM. Fifteen-year-old Eva was introduced to Apostle Aaron's son, Samuel (who lived in Veracruz), at her local church; Samuel was twenty-eight years old at the time, a minister at an LLDM church in Tepic, Nayarit, and immediately smitten with Eva. Given their conservative religious families, Eva was forbidden from dating; however, Eva's family eagerly welcomed twenty-eight-year-old Samuel's interest in fifteen-year-old Eva, and over the next eighteen months, Samuel visited Eva's family home when he came to Mexico City. Their courtship consisted entirely of a dozen family visits in Eva's home, and after a year and a half, twenty-nine-year-old Samuel asked Eva's father for sixteen-year-old Eva's hand in marriage. This conversation between the two men finalized Eva's betrothal. Samuel never asked Eva herself, but the young girl was smitten with her Apostle's son and happy for the engagement. Eva's father gladly accepted, and six months later, on May 18, 1962, in an LLDM church in Guadalajara, seventeen-year-old Eva married thirty-

year-old Samuel Joaquín. Ten months later, eighteen-year-old Eva gave birth to her first son, Benjamin. By the time Benjamin was one, Eva was pregnant again.

Two years after their wedding, Aaron died, and nineteen-year-old Eva suddenly became the wife of the new thirty-two-year-old Apostle of LLDM, Samuel. Eva and Samuel lived in Mexico for their entire fifty-two-year marriage, and for fifty of those years, he was the Apostle—treated with utmost reverence by all LLDM members throughout the world, including his wife. In all, Eva gave birth to seven children, six of whom survived to adulthood, one of whom became the Apostle in 2014 when Samuel died at age seventy-seven.

For every moment of her eighty-year life, Eva has been tightly woven into this faith community. Between birth and age seventeen, Eva attended Church weekly, and often twice a week. After her marriage at age seventeen in 1962, until her arrest in September 2025, Eva attended Church daily. That is, for the past sixty-three years (which is over twenty-three-thousand days), Eva attended Church daily, without exception. And for every single day that Eva attended Church, Eva tithed. Not only has she been a devoted member of the Faith, but realizing her importance as the Apostle's wife, Eva dedicated her entire life to charitable acts on behalf of her own non-profit organization, Fundación Eva García de Joaquín, through which she has distributed clothing and food in impoverished communities worldwide. For her non-profit and LLDM, Eva traveled the world extensively to spread the word of God and benevolence.

Even though Eva spent her entire life living in Mexico, does not speak English, and has only a sixth-grade education, after her husband Samuel's death in 2014, Eva relocated from Mexico to the LLDM residence in Los Angeles. Without Samuel, there was not much left in Mexico for her. With the exception of only two brothers, Eva's *entire* family are all United States citizens who live in the United States: the rest of her three siblings, all six of her living children, all of her eighty grandchildren and great-grandchildren, and all of her nieces, nephews, grandnieces, and grandnephews. Considering that family and Christianity are at the center of Eva's world, this move made perfect sense for her. For the past decade, Eva has lived quietly in Los Angeles as a lawful permanent resident, participating in worship and community life, continuing her non-profit work, and serving as a steady, maternal presence for congregants and her extended family.

Although Eva remains a Mexican citizen, for nearly a decade she has been anchored in the United States. As mentioned above, her immediate family is here,

including some of her siblings and all of her six children and eighty grandchildren and great-grandchildren. In fact, one of Eva's daughters primarily resides in Texas and regularly stays with Eva at the Los Angeles house with her own child. Eva's medical care, worship community, and daily routines are all based in the United States, and even when she has traveled abroad on Church business, those trips have always begun and ended at the same Los Angeles address. In practical terms, the United States—not Mexico—is now the center of her life.

### 3. The Vague Charges Against Eva

The indictment charges Eva with participation in a racketeering conspiracy (18 U.S.C. § 1962(d)) and a sex-trafficking conspiracy (18 U.S.C. § 1594(c)) tied to LLDM and to Samuel's historical leadership of the Faith.[4] Samuel led LLDM from 1964 until his death in 2014 and is a central figure in the indictment. Nearly all of the allegations against Eva concern conduct that allegedly occurred between the late 1960s and early 2000s, decades before this indictment.[5] Beyond these historical narratives, the government's charging theory simply folds Eva into a broad conspiracy alongside others in the LLDM hierarchy. In practical terms, the case against Eva boils down to the credibility of three or four potential trial witnesses recounting events from forty to sixty years ago, without contemporaneous physical or digital evidence to corroborate those ancient accounts. In other words, the charges against Eva are being held together by a thin, wispy thread.

The flimsy nature of the charges against Eva, taking into consideration the relevant factors that this Court has to consider in making its bail determination, all lead to one conclusion: Eva should be released pre-trial.

### B. Pretrial Detention Legal Standard

"Generally, a court must release a defendant on bail on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance when required and the safety of the community."[6] "The judicial officer shall order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the

---

[4] Indictment at ¶¶ 29 & 32.
[5] Govt. Det. Mem. at 10-11.
[6] *United States v. Madoff*, 586 F. Supp. 2d 240, 246 (S.D.N.Y. 2009).

court, . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."[7]  "The government may move for detention under either § 3142(f)(1) or § 3142(f)(2)."[8]  § 3142(f)(1) enumerates certain categories of offenses that require a detention hearing, and § 3142(f)(2) requires a detention hearing in cases that present a heightened risk of flight or danger to the community.[9]  Here, the government moves for Eva's detention pursuant to § 3142(f)(1)(A), (B), and (E), and contends it is entitled to a detention hearing.[10]  Eva does not dispute that a detention hearing is warranted here.

Pursuant to 18 U.S.C. § 3142(e)(3), when the government charges a defendant with certain crimes, "subject to rebuttal by the person," "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."[11]  But the six-count indictment here charges Eva in only two counts: a racketeering conspiracy under 18 U.S.C. § 1962(d) and a sex-trafficking conspiracy under 18 U.S.C. § 1594(c).  The government's detention argument relies heavily on the § 3142(e)(3) presumption, which is applicable here only because of the § 1594(c) sex-trafficking conspiracy count;[12] it does not apply to the racketeering conspiracy count, and the remaining four counts do not name Eva at all.

In rebutting the presumption of detention as to the presumption count, Eva's limited burden is only that of *production* vis-à-vis the risk of flight and dangerousness.[13] This means she is merely required to present *some* evidence that she does not pose a danger to the community or a risk of flight.[14]  Once a defendant has met her burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.[15]

---

[7] 18 U.S.C. § 3142(b).

[8] *Madoff*, 586 F. Supp. 2d at 247.

[9] *See* 18 U.S.C. § 3142(f)(1), (2).

[10] Govt. Det. Mem. at 9.

[11] 18 U.S.C. § 3142(e)(3).

[12] Govt. Det. Mem. at 9.

[13] *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011).

[14] *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986).

[15] *Id.* at 1144.

"To determine whether the presumptions of dangerousness and flight are rebutted," 18 U.S.C. § 3142(g) requires a court to consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person in the community that would be posed by the person's release.[16] Therefore, a defendant must present some evidence with respect to these factors that ultimately shows they are not a danger to the community nor a flight risk.

Importantly, the burden of production is different from the burden of persuasion. The burden of persuasion always remains with the government, even in a presumption case.[17] In order for the government to meet its burden of persuasion, it must: (1) "demonstrate by clear and convincing evidence that a defendant should not be released due to her risk of danger";[18] and (2) "by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight."[19] This same standard applies even where no presumption exists.[20]

As set out below, Eva easily meets her limited burden of production and thus rebuts any presumptions of dangerousness and flight. The government, in turn, cannot carry its burden of persuasion with respect to danger and flight. In other words, the government cannot show by clear and convincing evidence that Eva presents a danger to the community, nor can it show by a preponderance of the evidence that Eva presents a legitimate risk of flight.

---

[16] *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

[17] *United States v. Enix*, 209 F. Supp. 3d 557, 563 (W.D.N.Y. 2016); *see also Martir*, 782 F.2d at 1146.

[18] *Enix*, 209 F. Supp. 3d at 563 (explaining that "clear and convincing evidence means something more than preponderance and something less than beyond a reasonable doubt").

[19] *English*, 629 F.3d at 319.

[20] *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019).

### C. Eva's Circumstances Rebut the Statutory Presumption That No Conditions Will Reasonably Assure Her Appearance and the Safety of the Community

#### 1. Nature and Circumstances of the Offense Charged and Weight of the Evidence

The seriousness of charges alone is not a sufficient ground for detention.[21] The "gravity of an offense is not the only factor to be considered by the district court in deciding whether the conditions of release are adequate to ensure the defendants will not flee and do not constitute a continuing threat to the community."[22] It bears repeating that Eva is charged only with two counts in the multi-defendant six-count indictment. This is already indicative of her smaller role in the charged offenses. And while the counts against Eva are serious, the weight of the evidence against Eva is weak. Accordingly, it is incumbent on this Court to consider the first two factors of § 3142(g) together as they actually weigh in favor of Eva's release.

_The allegations against Eva and the weight of the evidence against her._

The government's detention letter makes clear that the direct, non-conspiracy allegations against Eva are finite, historical episodes: beginning in the late 1960s and early 1970s (when Eva would have been twenty-five to thirty-years old), she is alleged to have exposed one minor congregant to sexual materials and to have held that same victim down during a sexual assault by Samuel; in the late 1970s and 1980s, she is alleged to have facilitated Samuel's abuse of other minors by being present, touching or kissing them at his direction, or leaving a child alone with him; and in the late 1990s and early 2000s, she is alleged to have participated in group sex with a sixteen-year-old and to have told that now-adult victim that Samuel was "ready" for her before another assault. All of these episodes are alleged to have occurred decades ago, concentrated between the late 1960s and early 2000s. The government does not allege that Eva has engaged in any direct act of sexual abuse, facilitation, or grooming in the past twenty years.

---

[21] _See United States v. Mattis_, 963 F.3d 285, 293 (2d Cir. 2020) ("[W]hile the first two factors weigh[ed] against release because the crime was violent, reckless, and lawless, and the government's evidence [was] strong, release was warranted on balance").
[22] _Id._ at 292.

Beyond those historical episodes, Eva's additional involvement consists of vague participation in the conspiracy, and the indictment generally lumps Eva in with others in the LLDM hierarchy and attributing broad institutional conduct to "the Joaquín LLDM Enterprise" or to co-conspirators as a group.[23] As to Eva herself, however, the proof the government describes ultimately comes down to the testimony of a small handful of witnesses; the woman who says she was held down fifty years ago, in the early 1970s, the later teenagers who describe being groomed or touched forty and fifty years ago, and one or two additional complainants from thirty and forty years ago about whom the government offers narrative accounts rather than contemporaneous physical or digital corroboration. In other words, at least as to Eva, this is a classic credibility case about ancient events, turning on whether the jury believes three or four witnesses about conduct said to have occurred forty to fifty-plus years ago.

### *The government's expansive search recovered zero evidence of the presumption count for Eva.*

On September 10, 2025, the government executed searches on at least three properties: 113 N. Arizona Street (Eva's residence), 112 N. Dangler Street, and Ebenezer Ranch. During the search of all three locations, the government seized hundreds of items, photographed those items and the general premises, created catalogs, and shared that discovery with defense counsel for purposes of bail litigation. On top of those items, the government also included in that discovery photos taken of Eva during its surveillance of her in the month of August. According to the government, Eva has been involved in a sex-trafficking conspiracy for over fifty years and yet, despite the United States secretly surveilling her since at least August (and perhaps even for years before), using its grand jury subpoena power to uncover any records that could connect her to these crimes, and fully searching her home during a surprise warrant execution, not a single piece of discovery ties Eva to the presumption count against her.

In fact, the government's voluminous bail discovery confirms that no sexual memorabilia was recovered from Eva's residence in Los Angeles—113 N. Arizona St. Agents photographed and cataloged hundreds of household items at Eva's address, including correspondence, personal effects, and stored documents, yet not a single item suggested sexual activity, memorabilia, or any material connected to the charged sex abuse conduct for which the government is relying on the

---

[23] Indictment at ¶¶ 24(b)(c) & 28.

presumption of detention.[24]  This absence is telling: in a case alleging over half a century of sexual exploitation, one would expect at least some corroborating physical or digital evidence to be found in Eva's home if it were being used to further such offenses.  The complete absence of such evidence reinforces the opposite—that Eva's residence was a stable domestic environment, not a locus of a sex trafficking ring.  Here, the government's search militates in favor of release: the contents of Eva's home undercut any inference that she poses an ongoing danger to the community or has the capacity to re-offend if released.

Moreover, Eva has no knowledge or connection to any of the other addresses that the government searched, and the government has not provided evidence connecting her specifically to those addresses.  The government is not entitled to use evidence and paraphernalia from *other* searched addresses against Eva, absent a showing by clear and convincing evidence that Eva is connected to those residences and that recovered evidence.  Allowing the government to do otherwise directly contradicts the individualized analysis for each defendant required by the Bail Reform Act.

## 2.    History and Characteristics of the Defendant

Eva's age, unblemished history, and deep family and community ties all weigh heavily in favor of release.[25]

---

[24] To the extent the government attempts to argue that the racketeering charge also gives rise to the presumption of detention, like it did for co-defendant Joram Núñez Joaquín, *United States v. Joram Núñez Joaquín,* No. 25-cr-00558 (N.D. Ill. 2025), Dkt. No. 5 at 15, this Court should summarily reject that argument.  This Court should not permit the government to backdoor an additional presumption count by using the alleged underlying offense for the racketeering charge to claim that the racketeering offense should be elevated to a presumption count.  Such an action runs afoul of the explicit language in the statute which enumerates specific offenses as carrying the presumption of detention—racketeering is **not** one of those offenses.  Moreover, it would be especially improper here where the underlying presumption count itself—§ 1594(c)—lacks any supporting evidence whatsoever. Treating the racketeering charge here as a presumption count illegitimately stacks the deck against Eva through an improper and unjust reconstruction of § 3142(e)(3).

[25] *See Mattis*, 963 F.3d at 293.

### a. Eva's Personal History and Strong Ties to the Community Favor Release

In Section A.2 above, we set out in detail Eva's early life in Mexico, which primed her to hold in the highest regard first her father-in-law, the Apostle Aaron, and then, her own husband, Apostle Samuel. Since Samuel became the Apostle when Eva was nineteen, she has lived an incredibly public life. In Mexico, as the wife of the Apostle, Eva is widely recognized, known, and loved; as she traveled the world with him to do charity work—and continued her work after he died—the LLDM congregants worldwide know Eva, eagerly await her visits and benevolence, and watch her every move closely. This is extremely important because, as a public figure in a very large religious community, if Eva had conducted herself venally, corruptly, arrogantly, cruelly, or even rudely, her reputation would overflow with such complaints. To the contrary, she is beloved. After eighty years in the spotlight day and night, this Court should give substantial weight to the complete absence of bad behavior by Eva. Few defendants could claim such an unblemished record. Far from being a shadowy figure, Eva is a known quantity: for decades, congregants and neighbors have seen her up close as a gentle, generous, non-violent matriarch. Her "notoriety" is for kindness, not intimidation. It is difficult to square that lifelong public record with the government's attempt to portray this same eighty-year-old woman as a hardened criminal.

After Samuel's death, Eva chose Los Angeles to be close to her six children and eighty grandchildren and great-grandchildren; it is the physical center of her family life. She moved to grow old, surrounded by her family, not to support or facilitate any criminal enterprise. Despite living in a new country where she does not speak the language, Eva has continued her lifelong exceptional personal conduct in Los Angeles. In fact, Eva has lived at the same residence in California for the past ten years, demonstrating stability in the community. In addition to the reputation for generosity, compassion, and kindness Eva has earned for the past eighty years, most critically, Eva has no criminal history of any kind, in any country. For eighty years, she has maintained a spotless record, never once being accused of or involved in criminal activity until these charges. That history of law-abiding conduct—and her lifelong history of selfless, flawless comportment—weighs heavily against any suggestion she would now abandon court oversight.

####    b.    Decades of Community and Charitable Service

For more than four decades, Eva's public life has been defined by hands-on, face-to-face service to poor and working-class families. She has spent her time in church-organized programs that provided basic necessities, such as food, small gifts, and practical support to congregants, including women, children, and the elderly. This was not occasional or ceremonial work. Eva stood in the serving lines, handed out meals and packages herself, and focused on making sure that families of limited means received what they needed. The attached photographs, taken years apart, are a small sample of that long-standing pattern. They document Eva doing the same thing again and again: showing up in person, quietly serving, and putting the needs of her community before her own.

Since 1980, Eva has participated in church-organized gatherings at which food and gifts were distributed to congregants, especially women, children, widows, and elderly attendees.[26] On those occasions, Eva personally distributed the food and gifts and assisted in ensuring that families of limited means received food and other supplies.[27] This long-running pattern of practical, in-person service to her community dates back to the earliest years of Eva's adult life and has remained a constant throughout her public role. We attach photos of some of these events so the Court can see the real Eva García de Joaquín. These include:

- On September 24, 2016, Eva addressed a gathering of women at the 30th anniversary of the Fundación Eva García de Joaquín, celebrating a charity she helped build over the years and encouraging women in the congregation to seek help and support through the foundation's work.[28]
- On October 4, 2017, Eva convened and led a meeting at her foundation to review its charitable work and community development projects, focusing on how the foundation could better reach poor and working-class families and expand the services available to them.[29]
- On August 10, 2018, Eva spent the day at the foundation's dining area personally handing plates of food to visitors, making sure that each

---

[26] Exhibit A.
[27] Exhibit B.
[28] Exhibit C.
[29] Exhibit D.

person who came through the line was served with dignity
and respect.[30]

- On August 19, 2019, during the Holy Supper, Eva joined the serving
  line and handed meals directly to congregants, treating this major
  religious event as another opportunity to care for ordinary families
  who depended on the Church for their daily bread as much as for
  spiritual guidance.[31]

- On August 10, 2023, Eva upheld tradition and her commitment to
  personal service by handing out meals to congregants at her
  foundation's annual gathering.[32]

- On August 13, 2025, (one month before her arrest) in Guadalajara,
  Mexico, Eva again stood at the food line during her foundation's
  annual Holy Supper gathering and handed out meals to congregants
  and visitors alike, living her faith in the same pattern of daily service
  she has practiced for years.[33,34]

- Eva's foundation runs a charity house which provides free housing,
  food, and necessities for the elderly, many of whom are ill or disabled.
  During the August 2025 religious festivities, Eva took the time to
  address these elderly congregants who live in her charity house,
  sharing the Lord's message and a smile in appreciation of their efforts
  to worship and dine at her foundation's annual gathering.[35]

    In its detention letter, the government cited Eva's recent trip to Guadalajara
in August 2025 as evidence that she is a flight risk.[36]  Absconding is nefarious, and
the truth is the opposite.  Eva traveled to Guadalajara in August 2025 to serve the
LLDM congregants through her foundation, doing the same type of public,
documented, community-oriented work she has been doing since 1980.  Indeed, as
the evidence cited above demonstrates, Eva visited Mexico every year in August to
host her foundation's Holy Supper annual event.  And, as she did in preceding
years, Eva returned home to Los Angeles.  The government's attempt to recast this

---

[30] Exhibit E.
[31] Exhibit F.
[32] Exhibit G.
[33] Exhibit H.
[34] Eva also served food every single day of Holy Supper, which was August 9th
through August 15th this year.
[35] Exhibit I.
[36] Govt. Det. Mem. at 13.

trip as proof of Eva's intent to flee flies in the face of the reality of that trip, and the decades-long reality of Eva's life.

Taken together, these decades of consistent conduct show that Eva organized her life around direct charitable engagement with vulnerable families. The images we submit are not staged events or isolated photo opportunities; they capture what Eva has done, day after day and year after year—using her position not to enrich herself or to disappear, but to feed, support, and remain accountable to the community she serves and loves.

### c. Eva's Age and Physical Limitations Make Flight Practically Implausible

Eva's advanced age and physical condition further undermine any suggestion that she presents an actual risk of flight. She is eighty years old and lives with significant age-related physical limitations that require ongoing support. The government relies on Eva's recent international travel to argue that she could flee,[37] yet its own investigation shows that, on the very trip it cites from August 29, 2025,[38] Eva was being pushed in a wheelchair through the airport and traveling with a companion, underscoring that she does not and cannot move independently.[39] Those photographs are not proof of her ability to abscond; they instead confirm that Eva requires assistance and support from others for even routine travel. That the government could only amass photos of Eva—a public figure—in a wheelchair at an airport as evidence of her ability to abscond is telling. The government grasps at straws. Meanwhile, the public sphere contains a host of photographs, some of which we share as part of this submission, that demonstrate that Eva is exactly what those photographs show—a dedicated and religious lady who has devoted her life to serving her fellow Christians, helping the less fortunate, and taking care of her community.

Over the past two years, due to both her advanced age and the physical and mental difficulties inevitable with aging, Eva has not traveled internationally without someone accompanying her (usually her doctor). In fact, during the last ten years following the passing of her husband, Eva has almost always required help when traveling. In other words, her recent travel does not support the

---

[37] Govt. Det. Mem. at 13.
[38] *Id.*
[39] Exhibit J.

government's argument that Eva is a flight risk; rather, it proves the opposite.

Against that backdrop, it is simply not realistic to imagine that a frail eighty-year-old, who does not speak English, who needs help navigating airports and relies on others for mobility, would successfully orchestrate a clandestine escape, sever herself from her doctors and multi-generational family in the United States, and live as a fugitive abroad. Her physical limitations make such a scenario not only dangerous to her health but irrational in light of the stable life she has built here, and her demonstrated willingness to face these proceedings as discussed below.

### 3. Danger to the Community or an Individual

The government does not (and cannot) allege that Eva poses any present danger to the community or to any individual. It devotes no portion of its argument in its detention letter to contend that Eva presents a danger to the community. Eva is a frail, eighty-year-old, five-foot-tall woman with no history of violence, no criminal record, and no capacity or inclination to endanger others. Accordingly, this factor also weighs in favor of release.

### 4. Eva Clearly Rebuts the Statutory Presumption

In sum, as explained above, consideration of all the factors with respect to Eva clearly demonstrates that her circumstances rebut the presumption in favor of detention.

### D. The Government Cannot Show an Actual Risk of Flight

The government cannot meet its burden of persuasion that Eva is a flight risk because its arguments fall squarely into the category of *mere opportunity* to flee, not *actual risk* of flight. Courts have repeatedly distinguished the two. The government bears the burden of showing "by a preponderance of the evidence that the defendant . . . presents an **actual** risk of flight."[40] "Mere opportunity for flight is not sufficient."[41] Instead, several courts have observed that evidence

---

[40] *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (emphasis added).

[41] *United States v. Zarzuela*, No. 19-cr-851-GHW, 2019 U.S. Dist. LEXIS 206270, at *3 (S.D.N.Y. Nov. 27, 2019) (quoting *United States v. Himler*, 797 F.2d 156, 162 (3d Cir. 1986)).

substantiating "an actual risk of flight" must be something akin to evidence that the defendant possesses an intent to flee.[42]  That evidence is lacking here.

### 1.    Eva's Six-Year Track Record of Non-Flight Refutes Any Alleged Risk of Flight

On June 3, 2019, Eva's world came crashing down when California police arrested her son, Naasón.  Living only a few feet away from his house, Eva watched as agents swarmed his home, tearing it apart in a search.  That was the last time Eva saw her son free.  Eva watched the government prosecute her son (the Apostle), watched a California court set an unprecedented $50 million bond which effectively detained him, and has been watching him serve years of a decade-long sentence with the broken heart only a mother can understand.  Surely this is proof that Eva fully understands that everyone, including the Apostle, is subject to the laws of this country.  Plus, this is also proof that Eva fully understands that everyone potentially investigated—including her—could be facing at least a decade of prison.

Nevertheless, she did not flee, or even legally return to her homeland of Mexico.  Instead, she stayed in place, in a house that she knew the United States government could search (and that California had searched), and with all of the things the government found in that house.  Nothing stopped Eva from moving back to Mexico with all her belongings on June 4, 2019, or every single day after that.  But she chose to stay here, just as she will stay if this Court releases her.

Eva also understands, in a way most defendants never do, that there is no "getting away" from these charges.  As noted above, her own son, the Apostle, was arrested at a California airport as he traveled.  This serves as a vivid reminder to Eva that authorities can intercept anyone who attempts to flee and bring them back in handcuffs.  For Eva, her son's arrest confirms that flight is both futile and

---

[42] *See, e.g.*, *United States v. Hanson*, 613 F. Supp. 2d 85, 90 (D.D.C. 2009) ("In this case, . . . there is no strong circumstantial evidence indicating that Mrs. Hanson intends to flee the [U.S.]"); *United States v. Cole*, 715 F. Supp.  677, 680 (E.D. Pa. 1988) (defendants told undercover agents they would flee if arrested); *United States v. White*, No. 3:21-mj-04070, 2021 U.S. Dist. LEXIS 100544, at *21 (M.D. Tenn. May 27, 2021) ("A case involves a 'serious risk of flight,' as opposed to a mere risk of non-appearance, if it involves a serious risk that the defendant intentionally will avoid court proceedings").

contrary to the teachings of her Church; her response was not to run, but to remain exactly where the government knew she lived.

Eva's track record of non-flight has lasted at least six years, since Naasón's arrest in 2019. This record has held true despite her knowledge that LLDM, her son Naasón, and possibly she herself were under active legal scrutiny. Despite searches of the LLDM houses in California, a major civil suit[43] against LLDM, an ongoing federal criminal investigation in the Central District of California, and public reports explicitly naming her, she has remained in the United States, living at the same address in Los Angeles where she was arrested, as a lawful permanent resident. During this greater than six-year period, Eva traveled abroad, both in a personal capacity and for the missionary and charity work she conducted, but *always* returned to that home in Los Angeles. Eva never moved her assets out of a location she knew law enforcement could (and had already) searched, and when agents arrived to arrest her in September, she voluntarily provided the keys and combinations to the safes. Critically, despite the government's baseless accusations that Eva is an aspiring fugitive, Eva never used the cash and valuables found in her home to flee or fund a fugitive life.

The government bluntly gestures towards co-defendant Azalia, who was implicated in Naasón's first case and never entered the United States to face criminal charges, and attempts to paint Eva with the same fugitive brush. But unlike co-defendant Azalia, who is a fugitive, Eva "heard the footsteps" for years, and stayed put. In fact, as the government's own detention letter shows, for at least a decade, Eva allegedly had the means, foreign ties, and church network to relocate comfortably to places like Mexico, Ecuador, or Venezuela, *and yet* chose to stay put in the one place the government knew exactly where to find her.

### 2. The Existence of Foreign LLDM Church Outposts is Neither Here nor There

The government asserts that because the LLDM church is headquartered in Guadalajara and has outposts in countries such as Ecuador and Venezuela, Eva could call on "loyalists" to aid her flight. This conjecture is purely speculative. The government does not even allege that Eva has ever communicated with, or exercised control over, any of these outposts. There is no showing that she has

---

[43] *Martin v. La Luz del Mundo*, No. 2:20-cv-01437-FWS-AS (C.D. Cal. Mar. 10, 2020).

personal ties, relationships, or access to individuals at these foreign locations. The government has provided no indicia of an intent to use these outposts as a method of flight. Without proof of such a nexus, the claim that "loyalists" might assist her is spectral speculation and does not demonstrate an actual risk of flight or an intent to flee.

### 3. Eva's Mexican Citizenship is not Dispositive of the Risk of Flight

The government contends that because Eva is a Mexican citizen, she has both the motive and ability to flee, and that extradition would be challenging. But that is not the legal test under the Bail Reform Act: courts treat citizenship and foreign ties as just one aspect of a defendant's "history and characteristics" under § 3142(g)(3), to be weighed against countervailing factors such as lawful immigration status, length of residence in the United States, the presence of close family here, community ties, medical needs, and past compliance with law enforcement and court orders. When those factors are taken into account, Eva is not similarly situated to the foreign defendants the government invokes—instead, she is a lawful permanent resident whose life for nearly a decade has been rooted in Los Angeles, surrounded by her children, siblings, grandchildren, and great-grandchildren in the United States, and nothing in the record suggests any intent by her to abandon that life and flee.

In fact, all six of her children reside in the United States and are American citizens; all but two of her siblings reside in the United States and are American citizens; and she has eighty grandchildren and great-grandchildren in the United States, all of whom are American citizens. The government cannot credibly lump Eva together with defendants who have no U.S. immigration status or residence, or scores of immediate family members in the country.

The mere fact that a defendant is a foreign national with financial means is insufficient to deny bail. *See generally Hung v. United States*, 439 U.S. 1326 (1978) (Brennan, J.). In *Hung*, the Supreme Court reversed a post-conviction detention order of a Vietnamese national and granted his release pending appeal. *Id.* at 1329. The Court explained that even though the defendant had "not established a permanent residence in this country; and[,] should applicant flee to Vietnam, the United States would have no means to procure his return[,] . . . these considerations suggest opportunities for flight, they hardly establish any inclination on the part of applicant to flee." *Id.* Similarly, in *Hansen*, the Sixth Circuit

affirmed a district court's pretrial release of a Danish defendant despite the government's inability to extradite him from Denmark. The court explained that "[t]he bail statute does not . . . require that foreign defendants be detained simply because their return cannot be guaranteed through extradition."[44]

Courts have consistently rejected the notion that foreign citizenship or foreign ties, standing alone, establish an actual intent to flee. In further evidence of this, we attach a list of nearly twenty federal cases in other districts in which courts have granted pre-trial release to foreign citizens; in half of them, the courts allowed foreign defendants to return to their own countries pending trial.[45] Additionally, judges in this District have repeatedly granted bail to foreign nationals facing serious charges, often permitting international travel under conditions tailored to ensure appearance.

- ***United States v. Reichert,*** **No. 11-cr-1056 (S.D.N.Y. 2020)**: Reichert, a German citizen extradited to the United States on FCPA charges, was released on bail and even permitted to return to Germany, a jurisdiction where he could not be extradited. Despite both foreign nationality and the practical impossibility of re-extradition, the court-imposed conditions rather than detention.

- ***United States v. Black,*** **No. 16-cr-370 (S.D.N.Y. 2019)**: Black, a citizen of the United Kingdom and New Zealand charged with conspiracy to commit wire and bank fraud, was granted bail on a $500,000 bond. The court permitted him to travel freely between the U.S., U.K., and New Zealand, with procedures for additional foreign travel.

- ***United States v. Allen,*** **No. 14-cr-272 (S.D.N.Y. 2016)**: Allen, a U.K. citizen charged with LIBOR manipulation, was released on a $500,000 bond secured solely by U.K. real estate, permitted to keep his passport, and authorized to travel between the U.K. and France.

- ***United States v. Thompson,*** **No. 14-cr-272 (S.D.N.Y. 2016)**: Thompson, also a U.K. citizen charged with LIBOR manipulation, was released on a $500,000 bond secured by $90,000 cash and permitted to return to the U.K. with blanket travel authorization to Spain, France, Portugal, Greece,

---

[44] *United States v Hansen*, 108 F. App'x 331, 332 (6th Cir 2004) (emphasis added).
[45] Exhibit K. We note that this list is not exhaustive of all such cases.

Thailand, and other countries.

- ***United States v. Usher,* No. 17-cr-19 (S.D.N.Y. 2021)**: Usher, a U.K. citizen charged with conspiracy to commit antitrust violations, was released pre-trial on a $650,000 unsecured bond ($130,000 in cash), with travel permitted to the U.K.

These cases make clear that foreign ties, on their own, do not establish an actual risk of flight absent evidence of intent to flee. That those defendants were charged with large-scale financial crimes rather than sex-trafficking offenses does not alter the crux of the holdings, because the flight analysis in each turned on access to money, foreign citizenship, lack of extradition, and potential exposure to lengthy sentences—the very factors the government cites here.[46] If courts were willing to find that certain conditions could reasonably assure appearance for well-resourced foreign nationals accused of complex financial crimes, there is no principled basis to treat Eva more harshly where she is a lawful permanent resident with deep, longstanding family and community ties in the United States and where no evidence whatsoever has been offered of her intent to flee.

### 4. The Cash Smuggling Allegations Are Generalized and Irrelevant to Flight Risk

The government's allegation of a "cash smuggling scheme" to support detention is entirely speculative. It is framed as a collective allegation against the Joaquín family, without any specific nexus to Eva. Courts require individualized evidence of risk; generalized allegations about family or organizational conduct do not satisfy the government's burden.[47]

More importantly, even if one assumed *arguendo* that resources exist abroad, the mere availability of funds does not establish an intent to flee. If wealth alone could be cited as evidence of flight risk, every well-off defendant with foreign assets would be categorically disadvantaged under the Bail Reform Act. That result is contrary to the Act's design, which requires individualized findings. The relevant inquiry is whether Eva has taken steps to use or access such funds to evade trial, not whether money allegedly exists somewhere in the world. The government has made no such showing.

---

[46] Govt. Det. Mem. at 11-13.
[47] *Rodriguez v. Winski*, 444 F.Supp.3d 488 (S.D.N.Y. 2020).

## 5. Possibility of a Substantial Sentence

The government contends that the possibility of a substantial sentence in this case gives Eva every incentive to flee. However, it is well-established that a greater showing than the "commission of a serious crime and the fact of a potentially long sentence [is necessary] to support a finding of risk of flight."[48]

The government's reasoning is inverted when applied to an eighty-year-old lawful permanent resident with an established life in the United States. At her age, the idea that she would abandon her family, lawful status, and home, to become a fugitive, spending her remaining years of deteriorating health on the run and looking over her shoulder, is implausible. The government offers no explanation why an elderly woman would choose permanent exile and lifelong fugitive status over contesting the charges against her in court.

Thus, while the possibility of a substantial sentence is a relevant factor, it cannot override the individualized reality that Eva's age and circumstances strongly disincentivize flight.[49]

## 6. The Government Has Failed to Meet Its Flight Burden

Even when considered collectively, because each of the reasons provided by the government does not scratch the surface of making a legitimate showing of risk of flight, the government has failed to meet its burden of persuasion. This is especially so when considered against the stringent conditions proposed in Eva's bail package.

## E. The Government Cannot Show That Eva is a Danger to the Community

As demonstrated above in Section C.3, the government makes no attempt (because it cannot) to contend that Eva is a danger to the community. It certainly cannot make a showing to that effect by clear and convincing evidence, even with

---

[48] *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) (emphasis added); *accord United States v. Paulino*, 335 F. Supp. 3d 600, 619 (S.D.N.Y. 2018).

[49] *See United States v. Arena*, 878 F. Supp. 439, 442 (N.D.N.Y. 1995), aff'd, 125 F.3d 845 (2d Cir. 1997) (taking into account defendant's "advanced age" in granting bail).

the help of the presumption as a factor considered by the Court. Accordingly, this Court should release Eva according to her proposed bail package.

### F. Eva's Advanced Age and Condition Make Pre-Trial Detention Unsafe and Cruel in Violation of Eva's Due Process Rights

Eva is being held at the Essex County Correctional Facility ("ECC") in Newark, New Jersey. It is our understanding that she will remain there as long as she is in custody. ECC staff made the independent determination to place Eva in the infirmary and informed us that they intended to keep her there for the duration of her pre-trial incarceration. They made this determination, we understand, based on Eva's advanced age, medical condition, and the ECC staff's concerns about her well-being in the general population.[50]

On November 28, 2025, we were informed that ECC staff transferred Eva out of the infirmary and into general population because the infirmary has limited availability and someone with greater medical need at the time required placement in there. That the ECC knows Eva's health condition and wanted to house her in the infirmary, but cannot do so due to uncontrollable jail logistics, underscores the importance of her release here. Eva's placement in general population substantially increases the risk to her wellbeing and ECC is unfortunately handcuffed in its ability to remedy her circumstances.



---

[50] The ECC's determination that Eva's advanced age and declining health warrant her being kept in the infirmary corroborates Eva's arguments that her age and current condition make it difficult for her to flee.

[51] Exhibit L.

[52] *Id.*

Pre-trial incarceration limits Eva's ability to take the steps she needs to remain in good health. In fact, because Eva cannot access the medications and various implements she needs, pre-trial incarceration is an active health risk for Eva given her age and medical condition. Accordingly, these circumstances also strongly support her release.

Eva's continued detention does not just offend the Bail Reform Act, but also independently violates her due process rights under the Fourteenth Amendment. The Second Circuit has held that pre-trial detainees challenge unconstitutional conditions of confinement under the Due Process Clause—not the Eighth Amendment—and courts apply the same deliberate-indifference framework used in Eighth Amendment cases.[54] The "deliberate indifference" test developed under the Eighth Amendment requires a showing (1) that the deprivation is objectively so serious that it denies "the minimal civilized measure of life's necessities," and (2) that officials act with a sufficiently culpable state of mind—deliberate indifference to the detainee's health or safety.[55]

Eva's continued incarceration easily crosses that constitutional line. Objectively, forcing an eighty-year-old woman with the physical and mental difficulties inevitable for an octogenarian to remain in jail for months or years, knowing that the facility's inherent limitations expose her to heightened risks of infection, deterioration, and inadequate care, is a "sufficiently serious" deprivation of basic health and safety. Subjectively, both Essex County Correctional Facility and the government are fully aware of those risks: ECC has already concluded that

---

[53] *Id.*

[54] *Toliver v. City of New York*, 530 F. App'x 90, 92 n.1 (2d Cir. 2013) ("[The plaintiff] claims that he suffered cruel and unusual punishment. The district court accordingly treated his complaint as asserting violations of the Eighth Amendment. However, . . . [the plaintiff] may have been a pretrial detainee . . . . If so, the Eighth Amendment would not apply, as a pretrial detainee ... cannot be punished at all, and any . . . unconstitutional conditions claims should be analyzed under the Due Process Clause of the Fourteenth Amendment.") (citations, internal quotation marks, and some alterations omitted); *Brooks v. SecurusTech.net*, No. 13-CV-4646, 2014 WL 737683, at *3 (E.D.N.Y. Feb. 24, 2014); *Pagan v. Westchester Cnty.*, No. 12-CV-7669, 2014 WL 982876, at *16 (S.D.N.Y. Mar. 12, 2014).

[55] *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

she is too frail for general population and must be confined to the infirmary. Persisting in custodial detention under those conditions when a robust bail package is available to address any flight risk or danger concerns amounts to deliberate indifference to Eva's health and safety. It thus also constitutes punitive confinement in violation of the Fourteenth Amendment.

In short, when less restrictive conditions will reasonably secure appearance and protect the community, continuing to incarcerate a medically fragile pretrial detainee in circumstances that predictably exacerbate her health problems is not regulatory; it is unconstitutional punishment. On that independent due-process ground, the Court should order Eva's release on her proposed conditions.

### G. Pointed Precedent Supports Eva's Release

At least one court in this Circuit has faced a substantially similar case, albeit in a case in which the defendants were accused of far more egregious sexual misconduct than alleged against Eva, and that Court determined that pre-trial release of all of the defendants with certain conditions was appropriate. That case is *United States v. Jeffries, et al.*, 24-cr-423 (E.D.N.Y.)—a sex-trafficking presumption case.

Jeffries was the CEO of Abercrombie and Fitch ("AF"), and the government alleged that for years, he (along with his life partner, Matthew Smith) used the company to internationally sex traffic male models (who wanted to be in the prestigious AF ads) for the purpose of engaging in commercial sex acts with Jeffries and Smith, and then raped the models in exchange for promising them opportunities to model in the AF ads.[56] The government charged a third defendant, James Jacobson, with recruiting the models, coercing them, and raping them in advance of sending them to Jeffries and Smith for their own sexual gratification.[57] According to the indictment there, all three defendants, Michael Jeffries, James Jacobson, and Matthew Smith, were co-extensively involved in this long-running commercial sex operation.[58] As per the government: Jeffries funded and directed the enterprise;[59] Jacobson allegedly recruited, managed, and exploited men, arranged travel, handled payments, and enforced the scheme's rules.[60]

---

[56] *Jeffries* Govt. Det. Mem. at 2-3.

[57] *Id.* at 2.

[58] *Jeffries* Indictment at ¶ 4.

[59] *Id.* at ¶ 5.

[60] *Id.* at ¶ 8.

The allegations included some very graphic and sadistic claims, including that the defendants either personally injected or directed others to inject men in their penises with prescription-grade erection-inducing substances in order for the unwilling men to engage in sexual acts.[61]  The allegations contended that the defendants used drugs and alcohol to facilitate the alleged "Sex Events."[62]  The indictment further alleged that the defendants leveraged the models' employment, forced those men to sign non-disclosure agreements, and pressured several heterosexual men to perform anal sex against their will, including with the use of high-pressure enemas.[63]

On the government's telling, each defendant was fully embedded in the core criminal conduct: all three were charged with the same sex-trafficking count, 18 U.S.C. 1591 (carrying a maximum of life imprisonment), and the same series of interstate prostitution counts, and all three were alleged to have participated in "everything" the enterprise did.[64]

Thus, Jeffries involved three co-defendants whom the government claimed were running an active trafficking business, all subject to the same presumption of detention the government invokes here, and all facing extremely serious sentencing exposure.  Not only were the charges similar (and thus the presumption the same), but two of the defendants in *Jeffries* were elderly (age seventy-four and eighty), and one was a *non-citizen*.  Thus, for the older defendants, there was the same proposition of a mandatory minimum sentence equalling a life sentence and thus an alleged higher incentive to flee; and for the foreign defendant, risk of flight, ties to other countries, and extradition difficulties would have been a major factor in the bail decision.

Yet the government nevertheless conceded that conditions of release for *all three* defendants could reasonably assure their appearance and community safety. Despite such serious allegations, none of which are present for Eva, and a statutory presumption of detention, the government immediately agreed that two defendants in that case could be released on substantial secured bonds with stringent conditions, and a few months later agreed that the non-citizen defendant, Smith, could be released pretrial.  In sum, the government agreed to home detention and

---

[61] *Jeffries* Govt. Det. Mem. at 4.
[62] *Id.* at 3.
[63] *Id.* at 4.
[64] *Jeffries* Indictment at ¶ 2.

GPS monitoring with the following bail: $10 million secured for Jeffries (age eighty, U.S. citizen) and Smith (age sixty-one, non-citizen); and only $500,000 secured for Jacobson (age seventy-four, U.S. citizen).  That the government consented to pre-trial release in *Jeffries* for all defendants—all of whom were alleged to be equally culpable in similar, but far *worse* allegations than those Eva is facing, reveals the government's unjustifiable hypocrisy in demanding her detention.

There:
1. all three defendants were charged in sex trafficking presumption cases, facing mandatory minimum sentences;
2. all defendants had equal culpability and roles in the charged offenses;
3. the allegations against the defendants were remote in time (over a decade old), just like Eva;
4. Jeffries was the same age as Eva (eighty), two were *younger* (Jacobson at seventy-four and Smith at sixty-one);
5. both Jeffries and non-citizen Smith (who are life partners) had international connections and access to Jeffries' enormous wealth, including a $10,000,000 home owned by Jeffries;
6. for eighty-year-old Jeffries, the government agreed to a bail package of $10,000,000 (fully secured by Jeffries' *own home*) and only *two* sureties;
7. for non-citizen Smith, the youngest at sixty-one, the government agreed to a bail package of $10,000,000 secured by six sureties (which included co-defendant Jeffries) and three properties;
8. for Jacobson, age seventy-four, the government agreed to a bail package of only $500,000 secured by property and *two* sureties; and
9. all three defendants were released to home detention with GPS ankle-monitoring.

In this matter, the government has taken an unjustifiably contradictory position, despite the similarities between these cases, and the obviously more serious allegations about the *Jeffries* defendants.  Here, by the government's own account, Eva is an eighty-year-old widow whose direct alleged misconduct consists of discrete ancient episodes of "grooming" and, in one instance, holding someone down from the 1960s, 1970s, 1980s, and early 2000s; each *Jeffries* defendant was accused of operating "an international sex trafficking and prostitution business,"

funded by "millions of dollars," supported by a "massive infrastructure" and "dozens of people," and run as a "sprawling operation" dedicated to their sexual gratification and concealment."[65]  Here, the government's case against Eva turns on the credibility of a small group of witnesses about distant events; in *Jeffries,* the government claimed to have "dozens of witnesses" and "voluminous documentary evidence including emails, travel records, non-disclosure agreements, financial records and other documents."[66]  Here, the government alleges that Eva's conduct ended in the early 2000s (almost twenty years ago); in *Jeffries*, the government claimed the violent international sex trafficking conduct of *all defendants* continued until 2015.  This stark contrast exposes the government's position here as untenable under the Bail Reform Act.  The government's own treatment of the *Jeffries* defendants confirms that detention here is not compelled by law or evidence, but rather, reflects an arbitrary and inconsistent charging posture that this Court should not endorse.

If multi-million-dollar secured bonds, home detention, GPS monitoring, and other tailored conditions were sufficient in *Jeffries*, they are more than sufficient for an elderly, frail woman whose alleged direct acts are decades old and whose case hinges on uncorroborated memories of a few witnesses.  The government cannot reasonably maintain that release conditions were adequate in *Jeffries* but are somehow inadequate here.

## H.     Proposed Bail Package

In light of the fact that Eva is clearly not a flight risk nor a danger to the community, as well as the fact that there is pointed precedent that supports her release, we submit that the following bail conditions are sufficient to secure her pre-trial release.  Those conditions are:

- A $5,000,000 bond partially secured by $2,000,000 of property
- *Eight* co-signers, all of whom are U.S. citizens and residents, and blood relatives of Ms. de Joaquín
  - All eight people would post the homes in which they live, and one would post additional property
- Home detention with GPS ankle-monitoring
- All other standard conditions

---

[65] *Jeffries* Govt. Det. Mem. at 2.
[66] *Id.* at 6.

### Conclusion

Eva is a frail, eighty-year-old, law-abiding, lawful permanent resident of the United States. The crimes she is alleged to have committed are discrete, decades-old episodes that do not translate into any present danger or intent to flee; indeed, her recent history suggests the opposite. And the weight of the government's evidence against her hardly shifts the scale in favor of detention. Moreover, the government has failed to carry its burden of persuasion that no combination of conditions will reasonably assure her appearance or the safety of the community. The proposed conditions will do just that, especially when taking into account Eva's age, health, deep family and community ties in the United States, spotless criminal record, and demonstrated track record of non-flight. We respectfully request that the Court grant Eva pre-trial release on these conditions.

Respectfully submitted,

Priya Chaudhry